IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WHITE PEARL INVERSIONES, a foreign corporation, and SANLO CORP., a Florida corporation | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | No. 07 C 6365 |
| CEMUSA, INC., a New York corporation, | ) ) ) | Wayne R. Andersen District Judge |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This case is before the court on the motion of defendant, Cemusa, Inc. ("Cemusa") to dismiss the complaint pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(1) and 12(b)(6). For the reasons set forth below, the motion is granted.

## BACKGROUND

Plaintiffs White Pearl Inversiones ("White Pearl") and Sanlo Corporation ("Sanlo") originally filed a ten count complaint against Cemusa in the Circuit Court of Cook County. Cemusa then removed the case to this court on November 9, 2007. The dispute in this case involves the payment of commissions by Cemusa to White Pearl and Sanlo for services that the plaintiffs allegedly rendered to Cemusa in order to facilitate Cemusa's successful bid for a contract with the City of New York to build street furniture, including bus stop shelters and public restrooms.

Cemusa is a subsidiary of a Spanish corporation that builds and installs street furniture in the United States. The street furniture typically bears advertising space that is sold to

advertisers, which creates a revenue stream for whomever installs it. Winning a bid to install street furniture in any given city is often competitive and involves a certain amount of lobbying. Accordingly, in 2002 and 2003 Cemusa discussed with the plaintiffs a strategy for putting together a successful bid in response to a request for proposal ("RFP") to build street furniture that Cemusa expected the City of New York would issue. Pursuant to those discussions Cemusa entered into an agreement (the "pre-RFP Agreement") with the plaintiffs on March 25, 2003. The relevant portions of the pre-RFP Agreement provide that the plaintiffs would,

>    (I) In anticipation to the release of the RFP, introduce Cemusa as an important international company operating with the design, manufacture, installation, leasing and management of street furniture in major markets, and as a competent party to provide such services to the City of New York within the same standards practiced by competitors such as J.C. Decaux, Clear Channel and Viacom;
>
>    (ii) Provide advice and guidance on the strategy to be adopted by Cemusa, as it relates to the City of New York street furniture market and local government concerns, starting on February, 2003 [sic].

Cmplt., Exh. 1 at p. 2.

The pre-RFP Agreement also provided that Cemusa was obligated to pay White Pearl $240,000 in four installments of $60,000 in exchange for the services listed above. Further, the agreement provided that, if Cemusa decided to present a response to the RFP issued by the City of New York, then the $240,000 "shall be deducted from any compensation owed by Cemusa to White Pearl pursuant to the Master Agreement or any other agreement arising therefrom." Cmplt., Exh. 1 at p. 2-3. The parties do not dispute that Cemusa paid White Pearl the $240,000 for the services White Pearl performed pursuant to the pre-RFP Agreement.

Further, the creation of the Master Agreement referred to in the language of the pre-RFP Agreement set forth above was contemplated by the pre-RFP Agreement, which stated,

> In the event a RFP is released, White Pearl and Cemusa agree to act in accordance with the terms and conditions set forth in the Master Consulting Agreement, to be agreed in the near future among White Pearl, Cemusa and Sanlo Corp. ("the Master Agreement").

Cmplt., Exh. 1 at p. 2.

On April 1, 2003, Cemusa, White Pearl, and Sanlo entered into the Master Agreement, which provides that the plaintiffs would continue to assist Cemusa in its efforts to develop a successful bid for the RFP issued by the City of New York. The Master Agreement included a percentage compensation provision, which stated,

> Percentage Compensation. The compensation (the "Percentage Compensation") payable to the Consultants, unless otherwise provided in the RFP Agreement, shall be in an amount equal to three and three-fourth percent (3.75%) of the Net Advertising Revenue, as hereinafter defined, received by Cemusa under the applicable Service Contract.

Cmplt., Exh. 2. This lawsuit is based on this percentage compensation provision in the Master Agreement. Because Cemusa ultimately won the bid to provide street furniture to the City of New York, White Pearl and Sanlo claim that they are entitled to 3.75% of the value of the contract. Plaintiffs further allege that they have not been paid this amount and that Cemusa has indicated that it has no outstanding obligations to the plaintiffs. Accordingly, plaintiffs filed a ten count complaint which asserts claims for: 1) Breach of Contract; 2) Breach of the Covenant of Good Faith and Fair Dealing; 3) Promissory Estoppel; 4) Common Law Fraud; 5) Equitable Estoppel; 6) Quantum Meruit; 7) Unjust Enrichment; 8) Enforcement of Settlement Agreement; 9) Declaratory Relief; and 10) Accounting.

Cemusa brings the instant motion to dismiss the entirety of plaintiffs' claims because it contends that Cemusa terminated the Master Agreement prior to the issuance of the RFP by the City of New York, as it had a right to do according to the terms of the Master Agreement. Accordingly, Cemusa asserts that the terms of the Master Agreement are of no force and effect

and cannot form the basis for plaintiffs' contract claims. Furthermore, Cemusa states, and plaintiffs do not dispute, that plaintiffs have been paid the entire amount to which they were entitled under the pre-RFP Agreement ($240,000).

## STANDARD OF REVIEW

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court must accept all well-pled allegations in the complaint as true, and draw all reasonable inferences in a light favorable to the plaintiff. *Jackson v. E.J. Branch Corp.*, 176 F.3d 971, 978 (7th Cir. 1999). A complaint must describe the claim with sufficient detail as to give the defendants "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1964 (2007) *(quoting Conley v. Gibson,* 355 U.S. 41, 47 (1957)). Further, the "allegations must plausibly suggest that the defendant has a right to relief raising that possibility above a 'speculative level.'" *EEOC v. Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007) *(citing Twombly,* 127 S.Ct. at 1965).

Additionally, Federal Rule of Civil Procedure 9(b) requires that "in all averments of fraud or mistake, the circumstances of fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). Generally speaking, this standard of particularity requires that a plaintiff specify the "who, what, when, where and how" of the alleged fraud. *GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1078 (7th Cir. 1997). Simple conclusory allegations of fraud do not satisfy the Rule 9(b) standard. *United States ex rel. Gross v. Aids Research Alliance-Chicago*, 415 F.3d 601, 604-05 (7th Cir. 2005).

## DISCUSSION

Plaintiffs allege ten separate counts in their complaint. However, the crux of the complaint is plaintiffs' contention that they had a valid and enforceable contract with Cemusa that entitled them to 3.75% of the total value of Cemusa's service contract to build street furniture for the City of New York. We find that the plaintiffs do not sufficiently allege that they performed services above and beyond those for which they were compensated pursuant to the pre-RFP agreement. Further, we find that there was no valid contract that entitled the plaintiffs to a percentage compensation at the time the RFP was issued by the City of New York. Therefore, because White Pearl was paid $240,000 pursuant to the only valid contract that existed between the parties, the pre-RFP Agreement, and the plaintiffs fail to sufficiently allege that they performed additional services that would entitle them to recover from Cemusa, the complaint is hereby dismissed in its entirety.

I. **Plaintiffs failed to sufficiently allege services rendered to defendants that would entitle them to the percentage compensation set forth in the Master Agreement.**

First, our finding that plaintiffs are not entitled to the percentage compensation set forth in the Master Agreement is primarily based on the fact that plaintiffs failed to assert that they performed valuable services for Cemusa beyond the services for which they were paid $240,000 pursuant to the pre-RFP Agreement. Plaintiffs' complaint alleges that they spent up to $482,000 for the purpose of providing services to Cemusa. However, plaintiffs do not assert that any of these services were rendered after execution of the pre-RFP Agreement. Plaintiffs' complaint includes mushy allegations regarding trips made to New York and Madrid, as well as fees paid to other companies to "introduce" Cemusa to New York. However, none of the allegations specifically describe services that plaintiffs performed after performance on the original $240,000 contract.

This case is currently before this court on a motion to dismiss, so allegations of services performed after performance on the original contract are necessary to sufficiently plead breach of the Master Agreement by Cemusa and to withstand the motion. Such allegations are also necessary in order for plaintiffs to recover based on the alternative theories they attempted to plead, such as promissory estoppel and quantum meruit. Accordingly, because we find no allegations of additional services rendered by plaintiffs to Cemusa, Counts I (breach of contract) II (breach of covenant of good faith and fair dealing), III (promissory estoppel), VI (quantum meruit), VII (unjust enrichment), IX (declaratory relief), and X (accounting) are hereby dismissed. We now turn to the remaining counts in plaintiffs' complaint.

## II.     Plaintiffs fail to sufficiently plead fraud.

Count IV of the complaint alleges common law fraud against Cemusa. However, this claim fails for two reasons. First, based on the complaint and the exhibits attached thereto, we find no indication of fraud on the part of Cemusa. As stated above, plaintiffs allegations indicate that plaintiffs performed services on behalf of Cemusa pursuant to the pre-RFP agreement and were compensated for such services. Accordingly, we find that those circumstances contradict any allegations of a fraud perpetrated by Cemusa.

Second, plaintiffs fail to sufficiently plead fraud under Rule 9(b). As stated above, Rule 9(b) of the Federal Rules of Civil Procedure requires allegations of fraud be pled with specificity. Even taking as true plaintiffs' allegations that Cemusa's promise to share the advertising revenue for the New York City Service Contract with plaintiffs was fraudulent, notwithstanding other aspects of the complaint and exhibits that demonstrate otherwise, plaintiffs fail to plead the time, place, and content of the alleged fraudulent communication between

6

Cemusa and the plaintiffs. *Graue Mill Dev. Corp. v. Colonial Bank & Trust Co. of Chi.*, 927 F.32 988, 992-93 (7th Cir. 1991)(affirming district court's dismissal of fraud claim because it did not allege the specific content of the misrepresentation, or the time, place, or individuals involved). Rather, plaintiffs simply make a broad allegation that Cemusa promised to share advertising revenue with plaintiffs. Such an allegation is not sufficient. *Id; see also Flynn v. Merrick*, 881 F.2d 446, 449 (7th Cir. 1989) (quoting *Hayduk v. Lanna*, 775 F.2d 441, 444 (1st Cir. 1985)) ("'mere allegations of fraud...,averments to conditions of mind, or references to plans and schemes are too conclusional to satisfy the particularity requirements.'"). Here, plaintiffs do not even allege a plan or scheme perpetrated by Cemusa, but simply allege that there was an agreement to enter into an agreement to share advertising revenue between the plaintiffs and Cemusa. That agreement was subsequently entered into, but then terminated, as plaintiffs acknowledged was Cemusa's right. Therefore, we find that not only do the totality of the pleadings belie any indication of fraud, plaintiffs have failed to sufficiently plead fraud pursuant to Rule 9(b).

**III.** **Plaintiffs failed to sufficiently plead the elements of equitable estoppel.**

Count V of plaintiff's complaint alleges that Cemusa is equitably estopped from terminating the master agreement under the terms of the pre-RFP Agreement and the Master Agreement. "The elements for equitable estoppel include (1) an action or non-action that induces (2) reliance by another, either in the form of action or non-action, (3) to his or her detriment." *St. Paul Mercury Ins. Co. v. Viking Corp.*, 539 F.3d 623 (7th Cir. 2008) (citing *Russ v. Russ*, 734 N.W.2d 874, 885 (Wis. 2007)). Plaintiffs' complaint fails to allege the elements of equitable estoppel. First, the complaint includes no specific allegation that the plaintiffs relied

on the Master Agreement to their detriment. As we determined above, plaintiffs were compensated for all services they rendered to Cemusa pursuant to the pre-RFP Agreement, and plaintiffs fail to set forth any clear allegation of additional services rendered in reliance on the Master Agreement.

Furthermore, any reliance on the Master Agreement by the plaintiffs was unfounded because the Master Agreement states that either party had the right to terminate the contract "upon thirty (30) days prior written notice to the other parties." Cmplt., Exh. 2. After Cemusa sent the letter to plaintiffs terminating the Master Agreement, Plaintiffs even acknowledged that "CEMUSA has the unilateral right to terminate the Master Agreement." Cmplt., Exh. 4. Because Cemusa terminated the contract at a time when there were no RFP contracts pending between the parties, the plaintiffs were not entitled to any additional compensation beyond the $240,000, as laid out in the Master Agreement. Cmplt., Exh. 2. Accordingly, any additional services that plaintiffs may have performed for Cemusa were based on reliance upon a contract that they knew could be terminated at any time.

**IV.     The totality of the pleadings and exhibits indicates that there was no valid settlement agreement between the parties.**

Finally, Count XIII of plaintiffs' complaint asks this court to enforce an alleged settlement agreement between the parties in which Cemusa allegedly offered to execute a new Consulting Agreement with the plaintiffs which would entitle them to compensation up to $2 million. Plaintiffs allege that the alleged offer was accepted by them and that Cemusa then wrongfully revoked the offer after plaintiffs accepted it. However, settlement agreements are contracts that are interpreted as any other contracts would be. *People ex rel. Dept. of Public Health v. Wiley*, 843 N.E.2d 259, 268 (Ill. 2006). Accordingly, a settlement agreement requires

8

a "meeting of the minds" regarding the material terms of the transaction. *Abbott Laboratories v. Alpha Therapeutic Corp.*, 164 F.3d 385, 387 (7th Cir. 1999).

It is true that "anticipation of a more formal future writing does not nullify an otherwise binding mutual agreement," and "informal writings between parties can constitute a binding settlement agreement unless the parties decide to expressly condition their deal on the signing of a formal document." *Id.* at 388 (citing *Dawseon v. Gen. Motors Corp.*, 977 F.2d 369, 374 (7th Cir. 1992); *Empro Mfg. Co. v. Ball-Co Mfg., Inc.*, 870 F.2d 423, 425 (7th Cir. 1989)). However, "informal writings must still manifest each party's intent to be bound by the material terms proposed." *Abbott Labs.*, 164 F.3d at 389.

Here, the exhibits attached to the complaint demonstrate that there was no intent to be bound by the proposed terms and, thus, no meeting of the minds. First, in this case the settlement agreement is unsigned and referred to as a "borrador" or rough draft in the cover e-mail. Cmplt., Exh. 7. Additionally, the e-mail correspondence that follows the original proposed settlement indicates that Cemusa was still working with its attorneys regarding the settlement agreement. Cmplt., Exh. 8. Finally, an e-mail sent on October 8, 2004 indicates that as far as Cemusa was concerned, no satisfactory draft that complied with New York law existed. Cmplt., Exh. 10. Thus, based on the October 8, 2004 e-mail, it is clear that Cemusa was not satisfied with the proposed agreement because it felt it did not comply with New York law, which prohibits payments for lobbying services used to gain a municipal contact, and it would be unreasonable to find that Cemusa intended to be bound by an agreement that it thought was illegal.

Accordingly, we find that plaintiffs' conclusory allegation that a settlement agreement existed is clearly contradicted by the exhibits regarding the proposed agreement that are attached to the complaint. Therefore, Count XIII of plaintiffs' complaint is hereby dismissed.

V.     **The relief plaintiffs seek is illegal.**

In addition to the aforementioned reasons as to why plaintiffs' complaint should be dismissed, we also note that the relief plaintiffs seek is illegal and they should not be permitted to recover based upon alleged services rendered in violation of the laws of the City of New York. New York City Administrative Code prohibits payments to lobbyists that are contingent in whole or in part on the award of a contract by a governmental body. The code provides in relevant part:

> No client shall retain or employ any lobbyist for compensation, the rate or amount of which compensation in whole or part is contingent or dependent upon legislative, executive or administrative action where efforts by a lobbyist to influence such action are subject to the jurisdiction of the city clerk, and no person shall accept such a retainer or employment.

N.Y.C. Admin. Code § 3-218. Further, lobbying activity under the statute includes:

> any attempt to influence...(iii) any determination made by an elected city official or an officer or employee of the city with respect to the procurement of goods, services or construction, including the preparation of contract specifications, or the solicitation, award or administration of a contract, or with respect to the solicitation, award or administration of a grant, loan, or agreement involving the disbursement of public monies.

N.Y.C. Admin. Code § 3-211.

We find that the law of the City of New York prohibits plaintiffs' recovery because the Master Agreement and the proposed settlement agreement both entitle plaintiffs to compensation in exchange for lobbying services *if* Cemusa obtained the service contract with the City of New York. First, the services plaintiffs offered to render were clearly lobbying

10

services. The description of the alleged services in plaintiffs' complaint clearly fall within the definition of "lobbying" pursuant to the above statute and plaintiffs specifically allege in their complaint that they performed "valuable consulting and lobbying services on behalf of Cemusa." Cmplt., ¶ 98.

Second, while the pre-RFP Agreement provided for a flat fee to White Pearl in exchange for White Pearl's advice to Cemusa regarding a strategy to obtain the New York Service Contract, as well as introducing Cemusa to relevant parties as a company competent in meeting the needs of the City of New York for street furniture and was not contingent upon Cemusa obtaining the contract, the plaintiffs were only entitled to compensation under both the Master Agreement and the proposed settlement if Cemusa obtained the New York City Service Contract. . Cmplt., Exh. 1 at 2, Exh. 2, Exh. 7.

The plaintiffs attempt to distinguish their alleged activities from those prohibited by the New York City Administrative Code by arguing that they did not provide lobbying services to Cemusa, but hired other firms to provide such services at a flat fee. However, this argument is disingenuous and is explicitly contradicted by plaintiffs' own allegation that they provided lobbying services to Cemusa, as well as other allegations in the complaint describing plaintiffs alleged services. Cmplt., ¶¶ 28, 41, 98. Furthermore, the proposed settlement agreement also attempts to evade the law by including language stating that the activities plaintiffs were engaged in on behalf of Cemusa were not lobbying activities as defined in Section 3-211. However, again, the allegations in the complaint describing the alleged services rendered directly contradict that language, and simply inserting such a statement into the agreement does not make it so. Cmplt, Exh. 7 at p.2; ¶¶ 28, 41, 98.

11

The law is clear that "contracts for the performance of an illegal act are deemed void and unenforceable." *U.S. Nursing Corp. v. St. Joseph Med. Ctr.*, 39 F.3d 790, 792 (7th Cir. 1994). Furthermore, any equitable claims based upon an illegal contract must also be dismissed. *See Rockford Drop Forge Co. v. Pollution Control Bd.*, 582 N.E.2d 253, 258 (Ill. App. Ct. 1991)("[A] Court may not simply dispense with plain requirements of statute by drawing on its equitable powers."). Accordingly, we cannot enforce any contract claim which would entitle plaintiffs to compensation that was contingent upon Cemusa receiving the New York City Service Contract because such a contract is prohibited by law. Therefore, plaintiffs complaint is also dismissed upon the basis that the relief they seek is illegal.

## **CONCLUSION**

For the reasons set forth above, defendant's motion to dismiss [48] is granted. This is a final and appealable order and this case is hereby terminated.

_____
Wayne R. Andersen
United States District Court

Dated: March 11, 2009_____